*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0946**

In the Matter of the Welfare of the Children of: S. W. N. and J. L. P., Parents.

**Filed October 6, 2014
Reversed
Schellhas, Judge**

Winona County District Court
File No. 85-JV-14-15

Samuel D. Jandt, Jandt Law Office, La Crescent, Minnesota (for appellant S.W.N.)

Michael A. Murphy, Hammell & Murphy, P.L.L.P., Caledonia, Minnesota (for respondents D.P. and K.P.)

Bruce A. Nelson, Winona, Minnesota (for respondent J.L.P.)

Catherine Schofield, Winona, Minnesota (guardian ad litem)

Considered and decided by Rodenberg, Presiding Judge; Worke, Judge; and Schellhas, Judge.

## U N P U B L I S H E D   O P I N I O N

**SCHELLHAS**, Judge

Appellant challenges the district court's termination of his parental rights, arguing that the record lacks clear and convincing evidence that he is palpably unfit to parent and that a child suffered egregious harm in his care. We reverse.

## FACTS[1]

Appellant-father S.W.N. and J.L.P. married on December 23, 2004.[2] J.L.P.'s parents are her legal guardians and conservators. The record reflects that S.W.N.'s relationship with J.L.P.'s parents—his in-laws—was acrimonious before the parties' marriage and thereafter. On September 17, 2005, J.L.P. gave birth to T.L.N. In October 2005, J.L.P. petitioned the district court for an order for protection (OFP) against S.W.N. to protect herself and T.L.N. The district court dismissed the petition.

On April 26, 2008, J.L.P. gave birth to D.H.N. In July 2008, J.L.P. petitioned the district court for an OFP against S.W.N. to protect herself, T.L.N., and D.H.N. (the children). On July 8, 2008, the district court issued an ex parte OFP. In J.L.P.'s affidavit and petition for the OFP, J.L.P. made the following allegations:

> Slamming [T.L.N.] on potty chair so hard she has (ongoing) bruises on tailbone. He jerks shopping cart to make [T.L.N.] (6-5-08) sit down. I was looking at the shelf in the store for groceries when I heard [T.L.N.] crying and I looked and she was laying on the floor. [S.W.N.] said she was leaning over the side and fell.
>
> . . . .

---

[1]The district court took judicial notice of the following court files without objection by the parties: 85-FA-08-2838 (marriage dissolution); 85-FA-08-1915 (domestic abuse); 85-FA-07-498 (grandparent visitation); 85-CV-07-230 (harassment); 85-CV-08-2592 (harassment); 85-FA-05-453 (domestic abuse). Some of the facts set forth in this opinion are taken from J.L.P.'s sworn submissions to the district court in those files. Some facts are taken from the district court's orders in those files.

[2] The record reveals that both parents have disabilities. S.W.N.'s disabilities appear to relate to his mental health, and J.L.P.'s disabilities appear to relate to her intellectual development.

[S.W.N.] and I have known each other since 2001. We are married now and have been separated several times. We have two children, a 2-1/2-year-old and a newborn. [S.W.N.] is very controlling and lies to me about my family and won't let me talk to them alone. Our 2-1/2-year-old has been hit by him. She has unusual bruises on her face and back and she says "daddy naughty" and points to her bruises. She is clearly afraid of him. He has also pushed her down and he forcibly grabs her and leaves bruises on her arms. He squeezes the newborn and doesn't support his head. [S.W.N.] lifts the baby by his clothes to move him out of the way, because he doesn't want to get up. I need this [OFP] to protect my children because I'm very worried about their safety when they are with him.

J.L.P. and S.W.N. stipulated to continue the conditions in the ex parte OFP, as modified, and the district court issued a one-year OFP on August 22, 2008, "without a finding of abuse." The OFP granted S.W.N. twice-weekly supervised parenting time with the children. In September 2008, J.L.P. petitioned the district court for marriage dissolution, and her parents, D.P. and K.P. (the grandparents), intervened and sought sole legal and physical custody of the children.

In June 2009, J.L.P. applied to the district court to extend the OFP, stating that, on May 7, 2009, she "[had] 911 called at visitation"; that "Sept. 12, 2008−[S.W.N.] drives past our home"; and that "March 23, 2009−[S.W.N.] tried to talk to [J.L.P.] at visitation." On August 28, 2009, based on the parties' agreement, the district court extended the OFP until final disposition in the marriage-dissolution case, noting that "[i]t is agreed and understood by the parties that the [OFP] is not being extended based upon any finding of a violation nor any determination that a violation has not occurred."

In October 2009, in a stipulated marriage-dissolution/third-party-custody judgment, the district court granted the grandparents sole legal custody and sole physical custody of the children. The court granted J.L.P. "liberal parenting time as deemed appropriate by [the grandparents]" and granted S.W.N. "supervised parenting time for two hours each week to be supervised by Family and Children's Center of Winona" (Family Center). The dissolution/third-party-custody judgment grants the grandparents the right to determine the day and time of S.W.N.'s parenting time based upon the staff availability at Family Center and S.W.N.'s part-time work schedule. The judgment also provides that S.W.N. is "solely responsible for all costs associated with the supervised visits" and that the grandparents are "responsible for all transportation associated with making the children available for the supervised visits." The judgment provides that, if Family Center is unavailable, "[S.W.N's] parenting time shall be exercised through a similar professional parenting supervision service."

From July 2008 to November 2010, S.W.N. exercised his parenting time with the children under the supervision of the grandparents' neighbor or Family Center. But Family Center discontinued its service to S.W.N. because it ceased accepting personal-check payments. In January 2011, S.W.N. began exercising his parenting time at Coulee Youth Center in La Crosse, Wisconsin, approximately a 40-minute drive from Winona. Although the record is unclear as to when, at some point, S.W.N. began exercising his parenting time every other week because of the associated expense. S.W.N. has not visited with T.L.N. since May 2013, due to T.L.N.'s refusal.

The children received therapy from multiple professionals. From August 2008 to January 2013, T.L.N. saw JoAnn Planavsky, a clinical social worker with Hiawatha Valley Mental Health Center. The record does not reflect why T.L.N's therapy with Ms. Planavsky terminated. From February 2013 until trial, T.L.N. saw Betty Lacine, MS, through Family Center. And from April 2013 until trial, T.L.N. saw LeAnne Morey, a psychiatric physician assistant with Winona Health. D.H.N. saw Betty Lacine from February 2013 until the time of trial.

In January 2014, stating their desire to adopt the children, the grandparents petitioned for termination of parental rights (TPR) on the grounds of abandonment, refusal or neglect to comply with parental duties, palpable unfitness, and egregious harm.[3] Also in January, the district court appointed a guardian ad litem (GAL) for the children. In February, the court ordered Steven C. Norton, PhD LP, to examine S.W.N. and diagnose his "mental condition" and, if he found S.W.N. to be "mentally ill," to explain "what if any limitations . . . his mental condition have on his ability to parent his children," and to provide "[a] statement of the factual basis on which the diagnosis [was] based."

The district court conducted a trial on April 9, 2014. Although notified of the proceeding in February, the county social services agency did not participate. After the trial but before the court ruled on the TPR petition, the grandparents dismissed the petition with respect to J.L.P., although she is not named in the petition. The district court

---

[3] The TPR petition does not name J.L.P. or refer to her parental rights but the grandparents served her with the petition and the district court appointed her legal counsel.

5

terminated S.W.N.'s parental rights based on its determinations that S.W.N. is palpably unfit and that a child experienced egregious harm in his care.

This appeal follows.

**D E C I S I O N**

"The U.S. Supreme Court has long recognized the fundamental nature of parental rights." *In re Welfare of Child of R.D.L.*, ___ N.W.2d ___, ___, 2014 WL 4437630, at *5 (Minn. Sept. 10, 2014). "[T]he Supreme Court [has] noted that the fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* (quotation omitted). A district court may terminate parental rights if: (1) one or more of nine statutory grounds exist for termination under Minn. Stat. § 260C.301, subd. 1(b); (2) either reasonable efforts have been made to reunify the child and parent, Minn. Stat. § 260C.301, subd. 8 (2012), or such efforts are not required, Minn. Stat. § 260.012(a) (2012); and (3) termination of parental rights is in the child's best interest. Minn. Stat. § 260C.301, subd. 7 (2012); *see also R.D.L.*, 2014 WL 4437630, at *9 ("[A]n involuntary termination of parental rights is proper only when at least one statutory ground for termination is supported by clear and convincing evidence *and* the termination is in the child's best interest."). "The burden of proof is upon the petitioner and is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of a child . . . ." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980) (citation omitted). "[T]ermination of parental rights is always discretionary with the juvenile court." *R.D.L.*, 2014 WL 4437630, at *8. "[T]he

6

court may, but is not required to, terminate a parent's rights when one of the nine statutory criteria is met." *Id.* (quotation omitted).

On appeal from a TPR, this court reviews the record to determine whether the evidence is clear and convincing. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004).

> "Clear and convincing" means exactly what is suggested by the ordinary meaning of the terms making up the phrase. The burden of clear and convincing evidence is less than that required by the "beyond a reasonable doubt" standard in criminal matters and is met when the truth of the fact to be proven is "highly probable." In order to prove a claim by clear and convincing evidence, a party's evidence should be unequivocal, intrinsically probable and credible, and free from frailties.

*Gassler v. State*, 787 N.W.2d 575, 583 (Minn. 2010) (citations omitted). "We . . . require that the evidence relating to termination must address conditions that exist at the time of the hearing, . . . and that it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period." *Chosa*, 290 N.W.2d at 769. We review a district court's "findings of the underlying or basic facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

Here, although S.W.N. does not challenge the factual findings in the district court's eight-page TPR order, we note that most of the court's findings are not true findings; they are recitations of the trial proceedings. *See In re Civil Commitment of Spicer*, ___ N.W.2d ___, ___, 2014 WL 4056029, at *6 (Minn. App. Aug. 18, 2014)

("[A] district court's recitation of what others have observed is not a finding of fact that those observations are true." (quotation omitted)). Such findings make our review more difficult.

*Palpable unfitness under Minn. Stat. § 260C.301, subd. 1(b)(4)*

Broken into its component parts, Minnesota Statutes section 260C.301, subdivision 1(b)(4), requires factual findings that manifest "(1) a consistent pattern of specific conduct before the child or specific conditions, (2) directly relating to the parent and child relationship, (3) of a duration or nature that renders the parent unable to care appropriately for the needs of the child, (4) for the reasonably foreseeable future." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 91 (Minn. App. 2012).

The district court concluded that S.W.N. is palpably unfit to be a party to the parent-child relationship, as follows:

> There is clear and convincing evidence that [S.W.N.] is unable to currently care for the children. The evidence shows a consistent pattern of [S.W.N.]'s conduct of a nature that is mentally and physically harmful to the children and damaging to the parent and child relationship. There is no evidence that within a foreseeable time, [S.W.N.] will be able to care for the children. The provision of services or future services for the purposes of rehabilitation is futile given [S.W.N.]'s lack of insight into the effects of his behavior on the children and his failure to address issues.

S.W.N. argues that clear and convincing evidence does not support this conclusion. We agree. Almost all of the evidence in the record pertains to acts of abuse that allegedly occurred prior to July 2008. This is troubling.

8

The district court admitted into evidence K.P.'s notes about statements allegedly made by T.L.N. regarding acts of abuse allegedly committed by S.W.N. against T.L.N. at unspecified times. The notes include T.L.N.'s purported statements that S.W.N. held her upside down and hit her as hard as he could, held her out a window and told her to shut up or he would drop her, punched her in the stomach and caused her to lose her breath, touched her "private parts" while she was on his lap, and held her tightly so that she could not move. We conclude that this evidence falls far short of addressing conditions that existed at the time of the trial, as required by *Chosa*.

The district court admitted into evidence excerpts from Lacine's notes taken during her visits with T.L.N. Lacine's notes include statements made by T.L.N., similar to K.P.'s notes, regarding the alleged abuse by S.W.N. Lacine testified that both children had suffered trauma. The district court admitted into evidence a letter from Morey, describing T.L.N.'s statements that she "remembered being abused by [S.W.N.]" And the district court admitted into evidence the GAL's report referencing J.L.P.'s 2008 OFP petition and affidavit. The GAL testified that S.W.N. had a history of harming the children, basing her testimony on statements by T.L.N., J.L.P., the grandparents, and reports made to child protection services in cases that were closed. All of the alleged acts of abuse occurred prior to the 2008 OFP. J.L.P. did not testify.

S.W.N. testified that he never harmed T.L.N. and would never "even conceive of hitting [the children] or doing those dirty things." He testified that the grandparents were manipulating the children into believing that he was bad. S.W.N.'s sister-in-law, C.N., testified that she did not notice S.W.N. act inappropriately toward her own children and

9

did not notice S.W.N.'s mental illness affecting his interaction with his children. S.W.N.'s brother, H.N., testified that S.W.N.'s interactions with H.N.'s children were appropriate. S.W.N.'s mother, S.N., testified that S.W.N. had interacted with her other grandchildren and that the interaction had been appropriate.[4]

Based on the record, S.W.N.'s alleged acts of abuse of T.L.N. had to have occurred prior to July 8, 2008, when the district court issued an ex parte OFP. On that date, T.L.N. was two years old. Since that date, T.L.N. has seen S.W.N. only in supervised settings, and she has not seen him at all since May 2013.

The grandparents claim that S.W.N. has been uncooperative in connection with his parenting time. According to K.P.'s notes and testimony, S.W.N. yelled at her and once exposed his buttocks to her in front of the children and S.N., the latter of whom denies the incident. K.P. also testified that S.W.N. refused to follow parenting-time protocols, such as exiting the visitation facility through the proper door to avoid contact with the grandparents. The district court admitted into evidence two recorded voicemail messages left by S.W.N. on the grandparents' answering machine in which S.W.N. used aggressive language and yelled angrily about the parties' ongoing personal and legal differences. K.P. testified that S.W.N. said mean things about D.P. and her to the children.

The district court admitted into evidence Dr. Norton's March 21, 2014 report regarding his psychological evaluation of S.W.N. Noting that his "evaluation should not in any way be construed as a child custody evaluation or a recommendation on

---

[4] According to S.N.'s testimony, the grandparents' attorney informed S.N. that she could not participate in S.W.N.'s supervised visits with the children.

termination of parental rights," Dr. Norton reported that S.W.N. "is an angry, hostile, paranoid individual" and that he meets the diagnostic criteria for dysthymia, early onset; paranoid personality disorder; and borderline intellectual functioning. Dr. Norton also noted that "[S.W.N.] focuses most heavily on the former in-laws and has an intense threatening attitude toward them" and opined that "[i]t is clear, [S.W.N.] would be unable to work effectively with the in-laws, or likely with anyone, in managing his children." Dr. Norton reported that S.W.N. "appears to care for his children but has very limited actual understanding of how to provide care." He also stated that "given [S.W.N.'s] current level of anger and paranoid ideation, and based on his limited awareness of appropriate parenting practices, he would have marked difficulty effectively providing for the positive and appropriate care of his children." Dr. Norton also testified that there is treatment that could help S.W.N. with his mental illnesses but that S.W.N. would be unwilling to engage in such treatment. We are troubled that the record contains no evidence that S.W.N. has been offered treatment or that he is, in fact, resistant to treatment.

Regarding the children's mental health concerns, Lacine testified that T.L.N. has posttraumatic stress disorder; is hyper vigilant and anxious; and has sleep issues, nightmares, and other fears and worries. Lacine also testified that T.L.N.'s visits with S.W.N. interfered with her progress in therapy. She testified that D.H.N. showed signs of trauma by disassociating when he was stressed and, in one of her letters, stated that D.H.N. had intense anxiety.

11

Morey testified that she diagnosed T.L.N. with attention deficit hyperactivity disorder (combined type), generalized anxiety disorder, and depressive disorder. She testified and opined in a letter that T.L.N.'s mental issues were exacerbated by visits with S.W.N., "retraumatiz[ing]" her with each visit and preventing her from healing.

K.P. testified that T.L.N. became scared and chewed her fingernails before visits with S.W.N. She said that T.L.N. did not act like herself and became sick on parenting-time days, sometimes experiencing bouts of diarrhea. T.L.N. even vomited after a visit. K.P.'s parenting-time notes indicated that T.L.N. said something was "wrong with her head."

T.L.N.'s former teacher, K.K., testified about an early interaction with T.L.N. in which she touched T.L.N.'s shoulder and T.L.N. reacted by screaming that K.K. was hurting her and not to touch her. She testified that T.L.N. acted withdrawn from staff and students after visits with S.W.N. K.K. also testified that T.L.N. seemed anxious and fearful. T.L.N.'s teacher at the time of trial, T.T., testified that T.L.N. exhibited signs of anxiety by picking at her ears and scalp, sometimes to the point of bleeding. T.L.N.'s behavior worsened around parenting time with S.W.N. D.H.N.'s preschool teacher, L.D., testified that D.H.N. displayed concerning behaviors leading up to parenting time, primarily crying for no apparent reason and not eating much.

Notably missing from the record evidence is any input from Planavsky, T.L.N.'s therapist from 2008 until January 2013, any input from the neutral parenting-time supervisors, any testimony from J.L.P., and any evidence regarding any treatment offered to S.W.N. to address his mental-health condition.

The witnesses' testimony was based almost entirely on statements made by T.L.N. about events that occurred when T.L.N. was age two or younger, J.L.P.'s allegations made in 2008, and witnesses' review of K.P.'s parenting-time notes. We conclude both that this evidence falls far short of addressing conditions that existed at the time of the trial and it does not constitute clear and convincing evidence that S.W.N. is palpably unfit. *See In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2001) ("[Evidence in support of termination] must relate to conditions that exist *at the time of termination* . . . ." (emphasis added)); *see also In re Welfare of Children of B.M.*, 845 N.W.2d 558, 564 (Minn. App. 2014) (treating as unpersuasive county's argument regarding father's past susceptibility to exploitation, which was no longer an issue at time of trial).

The district court found that S.W.N. is an uncontrollably angry person who struggles to cooperate with the grandparents, noting that he acted out toward the grandparents on certain occasions, sometimes yelling and, on one occasion, revealing his buttocks to K.P. Assuming the correctness of the court's findings, we conclude that they are insufficient to support a conclusion that S.W.N. is palpably unfit to be a party to the parent-child relationship with his children. "Parental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). The grandparents cite no legal authority to support the proposition that a parent's dislike of or inability to cooperate with his children's custodians, by itself, renders that parent palpably unfit to be a party to the parent-child relationship.

The grandparents' palpable-unfitness argument seems to relate to S.W.N.'s alleged abusive acts prior to the 2008 OFP and his anger-control issues. The grandparents claim

13

that S.W.N.'s parenting time with the children is harmful to their mental health because they relive the alleged abuse that they experienced and because S.W.N. is a generally angry person. The district court agreed that S.W.N. is palpably unfit based on the evidence, but we do not. Even if parenting time between T.L.N. and S.W.N. is presently not in T.L.N.'s best interest, terminating S.W.N's parental rights is not supported by clear and convincing evidence necessary to satisfy the statutory ground of palpable unfitness. *See In re Welfare of M.H.*, 595 N.W.2d 223, 227–29 (Minn. App. 1999) (affirming district court's decision not to terminate mother's parental rights even though child needed therapy, was *hesitant to see mother*, and termination would be in child's best interest). "[A] court may not base termination of parental rights solely on the best interests of a child." *Id.* at 228.

Here, the record contains no evidence that S.W.N.'s conduct ever caused Family Center or Coulee Youth Center to end S.W.N.'s parenting time early or to intervene during S.W.N.'s parenting time. Dr. Norton testified that collateral documents suggest that S.W.N.'s supervised parenting time was "fairly tense" and not "overly successful," and the GAL's report states that S.W.N. consistently attended parenting time. But the parenting-time supervisor for the three-year period preceding the TPR trial, L.L., reported that S.W.N. was for the most part appropriate, with the need for redirection at times. L.L. also reported that S.W.N.'s parenting time was neither improving nor worsening, and that S.W.N.'s parenting time was "going all right." We therefore conclude that clear and convincing evidence does not support the district court's conclusion that S.W.N. is palpably unfit to be a party to the parent-child relationship.

14

***Egregious harm***

The district court also terminated S.W.N.'s parental rights based on its conclusion that T.L.N. experienced egregious harm in S.W.N.'s care, as follows:

> There is clear and convincing evidence that [T.L.N.] has experienced egregious harm in [S.W.N.]'s care and that such harm shows [S.W.N.]'s lack of regard for the child's well-being and his gross inability to provide minimally adequate parental care to any child.

S.W.N. argues that clear and convincing evidence does not support this conclusion. We agree. Minnesota Statutes section 260C.301, subdivision 1(b)(6), provides that termination of parental rights may occur when

> a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care[.]

"'Egregious harm' means the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn. Stat. § 260C.007, subd. 14 (2012).

Without making true findings, the district court recited testimony and other evidence, stating that S.W.N. held T.L.N. tightly such that T.L.N. could not move; held T.L.N. outside an open window and threatened to drop her if she did not "shut up"; touched T.L.N.'s "private parts" while she sat on his lap; punched T.L.N. in the stomach; flipped T.L.N. upside down, held her by her ankles, and hit her as hard as he could; and slammed T.L.N. on a potty chair and squeezed her, resulting in bruising on her tailbone and arms. The only evidence that relates to these findings is evidence about conduct that

15

allegedly occurred prior to July 2008, and most of the evidence related to statements allegedly made by T.L.N. long after that time period.

After careful review of the record and assuming without deciding that S.W.N. committed the alleged acts of abuse against T.L.N., we conclude that the evidence is not clear and convincing that a child was egregiously harmed while in S.W.N.'s care within the meaning of Minnesota Statutes sections 260C.007, subdivision 14, .301, subdivision 1(b)(6). *See In re Welfare of Children of M.A.H.*, 839 N.W.2d 730, 730, 742 (Minn. App. 2013) (concluding that record supported district court's conclusion that egregious harm was experienced by severely malnourished child with protruding abdomen, below average bone growth, brain atrophy, and refeeding syndrome); *In re Welfare of Children of D.M.T.-R.*, 802 N.W.2d 759, 765–66 (Minn. App. 2011) (affirming TPR after validating "legal[] sound[ness]" of district court's conclusion that children experienced egregious harm when mother "hit[] them with her hands and with a belt and . . . punch[ed one of the children] in the mouth," "tied [two of the children] to chairs, taped their mouths shut, locked them in the basement, and told them that snakes and blood-sucking animals would harm them there"); *In re Welfare of A.S.*, 698 N.W.2d 190, 192–93, 198 (Minn. App. 2005) (affirming TPR after holding that "[c]lear and convincing evidence supports the district court's findings that father inflicted egregious harm on another child" whom father sexually assaulted), *review denied* (Minn. Sept. 20, 2005).

**Reversed.**